BELINDA M. VEGA, SB No. 208236
bmvega@Venable.com
VENABLE LLP
2049 Century Park East, Suite 2300
Los Angeles, CA 90067
Telephone:   310.229.9900
Facsimile:   310.229.9901

PAUL J. BATTISTA, Fla. Bar No. 884162
Pro Hac Vice Pending
pjbattista@Venable.com
MARIAELENA GAYO-GUITIAN, Fla. Bar No. 813818
Pro Hac Vice Pending
mguitian@venable.com
ERIC D. JACOBS, Fla. Bar No. 85992
Pro Hac Vice Pending
ejacobs@Venable.com
VENABLE LLP
801 Brickell Avenue, Suite 1500
Miami, Florida 33131
Telephone:   305.349.2300
Facsimile:   305.349.2301

*Proposed Attorneys for Debtors, The Little Brown Box Pizza, LLC and Kustom Partner, LLC*

**UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
SANTA ANA DIVISION**

| | |
|---|---|
| In re: | Lead Case No. 8:25-bk-13452-MH |
| THE LITTLE BROWN BOX PIZZA, LLC, & | Chapter 11 |
| KUSTON PARTNER, LLC | Subchapter V Case |
| Jointly Administered Debtors. | Jointly administered with Case No.8:25-bk-13453-MH |
| | **DECLARATION OF CARL CHANG IN SUPPORT OF CHAPTER 11 SUBCHAPTER V PETITION AND FIRST DAY MOTIONS** |
| ☒ Affects All Debtors<br>☐ Affects The Little Brown Box Pizza, LLC Only<br>☐ Affects Kustom Partner, LLC Only | Date:   December 11, 2025<br>Time:   3:00 pm<br>Place:   411 W. Fourth St.<br>            Santa Ana, CA 92701 |

I, Carl Chang, hereby declare under penalty of perjury to the best of my knowledge, information, and belief as follows:

# I. INTRODUCTION

1. I am the founder of The Little Brown Box Pizza, LLC, ("LBBP") and Kustom Partner, LLC ("KP", and together with LBBP, the "Debtors" and, each individually, a "Debtor"). I am authorized to submit this declaration (the "Chang Declaration") on behalf of the Debtors in connection with and in support of their bankruptcy filing and first day pleadings.

2. On December 8, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition (collectively, the "Petitions") in the United States Bankruptcy Court for the Central District of California (this "Court") for relief under chapter 11, subchapter V of title 11 of the United States Code, as amended (the "Bankruptcy Code"). The Debtors are continuing to operate the businesses and manage their affairs during the chapter 11 process.

3. To facilitate the Debtors' transition into chapter 11, the Debtors have requested certain "first day" relief in various applications and motions filed with the Court (collectively, the "First Day Motions"), requesting essential relief to stabilize operations, preserve going-concern value, protect employees, and minimize disruption to the Debtors' business. These First Day Motions include motions addressing payroll, cash management, lease rejection, tax compliance, and administrative matters. The First Day Motions also seek certain procedural relief that will facilitate the Debtors' orderly transition into chapter 11.

4. As a result of my history with the Debtors as their founder, review of relevant documents, and discussions with other members of the Debtors' management team and professionals, I am familiar with the Debtors and their day-to-day operations, business affairs, and books and records. I am authorized to submit this Declaration in support of the Petitions and the First Day Motions to assist the Court and other parties in interest in understanding the Debtors' corporate history, business operations, pre-petition corporate and capital structure, and the circumstances leading to the commencement of these chapter 11 cases.

5. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team

2

and the Debtors' advisors, my review of relevant documents and information concerning the Debtors' financial affairs and restructuring initiatives, or my opinions based upon my experience and knowledge. If called as a witness, I could and would testify competently to the statements set forth in this Declaration on that basis, as the information in this Declaration is accurate and correct to the best of my knowledge, information, and belief.

## II. DEBTORS' HISTORY AND BUSINESS OPERATIONS

### A. Corporate History and Business Operations

6. The Debtors and their non-debtor affiliates develop, own, operate, and franchise fast-casual restaurants that specialize in custom, made-to-order pizzas prepared using proprietary ingredients and high-temperature ovens as well as other food and drink products. Each restaurant follows standardized recipes, uses proprietary ingredients, and operates with high-temperature ovens to produce consistent and efficient service. As a result, the Debtors and their non-debtor affiliates have established a strong brand within the fast-casual sector under the "Pieology" tradename. Revenue for the Debtors is generated through sales at the Debtor-owned and operated restaurants. Pieology Franchise, LLC, a non-debtor affiliate, is the franchisor of the "Pieology" brand and separately franchises restaurants to third party franchisees under the "Pieology" tradename.

7. I founded the Debtors and their affiliates in 2011 with the goal of creating a fast-casual restaurant experience centered on customizable, high-quality, made-to-order pizzas. The Company opened its first location in Fullerton, California in 2011. Prior to the COVID-19 pandemic, the "Pieology" brand experienced strong growth and became known in the fast-casual sector for its efficient operations, and an upbeat in-restaurant dining experience. In addition to its U.S. presence, beginning in 2018, the Debtors and their non-debtor affiliates pursued international development efforts and through third party franchisees successfully opened thirteen restaurants abroad. These locations operated for a limited period but ultimately closed due to and not long after the COVID-19 pandemic which created severe operational and financial disruptions in connection therewith. Since that time, the Debtors and their non-debtor affiliates have focused exclusively on their U.S. operations.

3

8. As of the Petition Date, the "Pieology" system included forty-five (45) operating locations, consisting of sixteen (16) Debtor-owned and operated restaurants (after closing seventeen locations leading up to the within bankruptcy filing) and twenty-nine (29) franchised locations which are separately franchised by non-debtor Pieology Franchise, LLC to third party franchisees.

9. Like many businesses in the fast-casual sector, the Debtors experienced severe disruption due to the pandemic and subsequent economic environment, including labor shortages, inflationary cost pressure, and rapidly shifting consumer behavior. In response, the Debtors and their non-debtor affiliates invested heavily in off-premises and digital ordering channels, including online ordering, mobile ordering, delivery integration, and improved in-store pickup infrastructure. While these expansions and investments were necessary to remain competitive, they required substantial capital at a time when industry conditions remained volatile.

10. In the first half of 2024, the Debtors implemented a series of operational improvements at certain of their Debtor-owned restaurants, ranging from new kitchen equipment and service tools, including installing high-efficiency cooking and refrigeration equipment, to a redesigned menu architecture with simplified menu and pricing structure and targeted labor-efficiency initiatives, all of which was designed to improve throughput and labor efficiency, and refresh restaurant interiors to improve guest experience. These steps produced measurable improvements in throughput, customer satisfaction, store-level performance, labor efficiency, and food-cost consistency.

11. Building on this momentum, the Debtors negotiated a strategic acquisition of twenty-nine (29) underperforming franchised stores from the largest franchisee in the Pieology system, who was substantially past due on payment obligations and posed a risk to brand integrity. On March 26, 2025, the Debtors entered into a binding a purchase agreement to acquire twenty-nine underperforming franchised locations. The goal of the transaction was to stabilize system-wide performance, regain operational control over struggling restaurants, and expand the operational improvements across a larger group of stores. The acquisition closed on April 30, 2025 and was structured as a non-cash transaction, with the Debtors forgiving significant past-due

4

amounts owed by the franchisee.

12. The strategy depended on a committed infusion of new capital into the Debtors. Those funds were intended to support (i) the acquisition of new equipment for the expanded stable of Company-operated restaurants; (ii) investment in refreshing the image of a number of restaurants; and (iii) funding of anticipated short-term operating losses in the newly acquired restaurants as staffing, training and operational changes were implemented. However, shortly before closing, certain critical investors withdrew the funding commitment for reasons unrelated to the Debtor's performance. Despite the sudden loss of liquidity, the Debtors proceeded with the closing on April 30, 2025, to avoid litigation risk and prevent a collapse of the franchisee's operations, which would have severely harmed the brand.

13. Following the acquisition, the Debtors engaged in extensive efforts to secure replacement capital, including outreach to private equity groups and restaurant-sector investors. These efforts were ultimately unsuccessful. Without the capital infusion required to stabilize the acquired stores, the Debtors' liquidity rapidly deteriorated. Operating the expanded portfolio significantly increased cash demands—including payroll, food purchases, lease obligations, and maintenance costs—which the Debtors could not meet with available cash flow.

14. As a result, faced with limited options, mounting operational pressures, and insufficient liquidity to support the turnaround plan, the Debtors determined, after evaluating all alternatives and exercising their business judgment, including based on advice received from the Debtors' bankruptcy counsel and financial advisors, that filing for chapter 11 was necessary to preserve the value of the Debtors' businesses, prevent further erosion of liquidity, reject or renegotiate unprofitable leases, restructure ongoing obligations, and protect employees, customers, creditors and franchisees. Through these chapter 11 cases, the Debtors intend to streamline their footprint, focus resources on locations capable of achieving sustainable profitability, stabilize operations through the First Day Motions, and position the Debtors for a successful restructuring.

B. **Franchise System and Operations**

15. One of the Debtor's affiliates is Pieology Franchisor, LLC (the "Franchisor"). The Franchisor has developed the "Pieology" trademark and system, pursuant to which it licenses and

5

franchises "Pieology" restaurants to third party franchisees pursuant to the terms of certain franchise agreements. The Franchisor provides support and services to its franchisees to promote quality and consistency across its restaurant system, and to improve the customer experience. Under the franchise agreements, franchisees are generally granted the right to operate a restaurant in a particular location for a term of ten (10) years, with the ability to renew for one successor term of ten years each if certain conditions are met.

16. Each franchisee typically pays a $25,000 initial franchise fee and a monthly royalty fee of 5.0% of gross sales. Additionally, the franchise agreements require each the franchise location to contribute a percentage of its net sales to fund marketing and advertising campaigns. There are presently twenty-nine (29) franchised locations in the "Pieology" system.

17. The Franchisor has also entered into development agreements with franchisees interested in developing multiple franchise locations. These development agreements grant exclusive development rights within a designated territories in exchange for adherence to agreed-upon development schedules.

### III. THE DEBTORS' PREPETITION CORPORATE AND CAPITAL STRUCTURE

18. A summary chart depicting the Debtors' corporate structure is attached hereto as **Exhibit A**.

19. As of the Petition Date, the Debtors have no funded secured debt, and no recorded liens against their assets.

### IV. EVENTS LEADING TO THESE CHAPTER 11 CASES

20. The Debtors' financial distress and resulting need for chapter 11 relief stem from several converging factors. After launching successful operational improvements in 2024, the Debtors undertook a major strategic acquisition of underperforming franchised locations to stabilize system-wide operations. Although the acquisition was structured as a non-cash transaction, it depended on an equity infusion that was withdrawn shortly before closing. Without

6

the anticipated capital—and faced with the operating losses of the acquired stores—the Debtors' liquidity position deteriorated rapidly.

21. Despite implementing cost-control measures and pursuing additional capital sources, the Debtors' available liquidity was insufficient to sustain ongoing operations across the expanded portfolio. The cash demands associated with payroll, food and supply purchases, lease obligations, and maintenance costs exceeded the Debtors' capacity to fund them. Given the pace of cash burn, the Debtors concluded that chapter 11 protection was necessary to preserve going-concern value, restructure operational and financial obligations, and right-size the store footprint.

22. Through these chapter 11 cases, the Debtors intend to reject burdensome leases, focus capital and management attention on stores capable of achieving sustainable profitability, and stabilize operations for the benefit of employees, franchisees, landlords, vendors, customers, and other stakeholders. The Debtors believe that, with restructuring support, approximately sixteen (16) Debtor-operated restaurants can be preserved, thereby maintaining significant employment and protecting the broader franchise system.

## V. OVERVIEW OF THE FIRST DAY MOTIONS

23. The Debtors have filed several First Day Motions seeking narrowly tailored relief essential to preventing immediate and irreparable harm. These motions include:

### A. Cash Management Motion

24. In the ordinary course of business, the Debtors maintain an integrated, centralized cash management system (the "Cash Management System") that is comparable to other centralized cash management systems used to manage the cash of operating enterprises in a cost-effective, efficient manner. The Cash Management System is comprised of twenty-three (23) active bank accounts (each, a "Bank Account" and, collectively, the "Bank Accounts"), which are maintained at one bank – JPMorgan Chase Bank, NA ("JPMC") (the "Cash Management Bank"). In addition to the active Bank Accounts, the Debtors have twenty-three additional accounts that are tied to restaurants that were closed pre-petition and are no longer operating. The Debtors will close such additional bank accounts as soon as reasonably possible.

7

25. Specifically, the Debtors' cash management system depends on daily automated sweeps from restaurant locations that are performed by JPMC, which consolidate store-level deposits into the Debtors' primary operating account (the "LBBP Master Bank Account"). These sweeps capture revenue originating from multiple sources, including point-of-sale transactions, online ordering platforms, and third-party delivery services. The LBBP Master Bank Account, in turn, funds payroll, vendor disbursements, rent, insurance premiums, and other critical obligations. Disrupting this automated network of inflows and outflows would impair the Debtors' ability to efficiently operate their businesses, monitor liquidity in real time, forecast operational needs, and maintain the cash discipline required during these chapter 11 cases. The Debtors' cash management system has been in place for years and is fully embedded in daily operations.

26. Each Debtor-owned restaurant maintains a store-level deposit account to collect cash and credit sales (each a "Restaurant Bank Account"). All daily receipts are automatically swept into the LBBP Master Bank Account. When a restaurant needs to pay a vendor, funds are sent from the LBBP Master Bank Account to the applicable Restaurant Bank Account and the applicable vendor is paid directly. Any vendor credits or returns flow back to the LBBP Master Bank Account.

27. The Cash Management System includes a bank account (the "Franchise Bank Account") that is used to collect royalty and fee payments from franchisees of the non-debtor entity, Pieology Franchise, LLC, and remits them daily to the LBBP Master Bank Account. When franchise-related expenses arise, the LBBP Master Bank Account funds the Franchise Bank Account, which then pays the vendors of Pieology Franchise, LLC directly. Any vendor returns are sent back to the LBBP Master Bank Account. In essence, LBBP acts as a collecting and paying agent for Pieology Franchise, LLC as part of the integrated Cash Management System.

28. The Debtors hold surplus cash in an interest-bearing investment account (the "Investment Account"), which earns interest. Funds may be deposited when liquidity permits and transferred into the LBBP Master Bank Account when needed for operating expenses.

8

29. Payroll for all employees of the Debtors is disbursed through the Debtors' payroll account (the "Payroll Bank Account"). Prior to each payroll cycle, the LBBP Master Bank Account funds the Payroll Bank Account which then remits payment to the payroll processing company.

30. The Debtors use a separate bank account (the "AP Bank Account") to pay non-store-specific vendor payments that cannot be charged to individual store accounts — for example, companies like Coca-Cola that service multiple locations. Because most vendors are paid directly by the Restaurant Bank Account or the Franchise Bank Account, the AP Bank Account is used infrequently. The LBBP Master Bank Account transfers funds only when such centralized vendor payments are due.

31. In the ordinary course of business, the Debtors maintain a corporate credit card program through City National Bank to facilitate payment of routine business expenses incurred by certain authorized employees. These charges typically relate to ordinary course operating needs such as travel, supplies, and miscellaneous store-level and corporate expenditures. Approximately nine (9) cards are currently active, with average aggregate monthly charges of approximately $25,000.

32. The Debtors incur periodic service charges and fees in connection with the operation and maintenance of their Cash Management System (the "Bank Fees"). These charges—such as account maintenance fees, ACH fees, wire fees, and other service charges—are generally automatically debited by the Cash Management Bank from the applicable Bank Accounts each month. Historically, the Debtors incur approximately $19,000.00 in Bank Fees per month. As of the Petition Date, the Debtors estimate that approximately $5,000 in pre-petition Bank Fees have accrued and remain unpaid.

33. The Debtors generate revenue through three primary channels: (i) digital orders placed through the Pieology mobile app and website using a first party ordering platform provided

by the Debtors by Olo Inc.[1] (ii) digital orders placed through Olo's third-party marketplace integrations with delivery providers such as Uber Eats, DoorDash, and Grubhub, and (iii) in-restaurant sales processed through a point-of-sale system.

34. The Debtors and non-debtor affiliates historically engage in ordinary-course transactions with one another in connection with the operation of the Cash Management System (the "Intercompany Transactions"). These transactions give rise to intercompany receivables and payables (the "Intercompany Claims"). Intercompany Transactions occur routinely as funds are transferred among Debtors to support store-level operations, pay vendors, fund payroll, and manage centralized expenses.

35. The Debtors record all Intercompany Transactions and resulting balances in their accounting system through standard journal entries. The Debtors will continue to maintain accurate, contemporaneous records of all post-petition Intercompany Transactions in accordance with past practice, enabling them to trace and account for all movements of cash.

36. The Intercompany Transactions are an essential component of the Debtors' business operations. Any interruption would significantly impair liquidity management, disrupt operations, and harm the estates to the detriment of creditors.

37. In believe that the relief sought in the Cash Management Motion is essential to preserving liquidity and preventing immediate operational disruption. I believe that maintaining the existing system will (i) ensure uninterrupted receipt and consolidation of daily revenues; (ii) avoid delays in customer credit-card settlements and digital-ordering deposits; (iii) preserve the sweep mechanics that support the Debtors' ability to monitor cash; (iv) allow timely payment of payroll, rent, and vendor obligations; (v) maintain cost-effective internal controls; (vi) avoid the administrative burden and risk associated with opening dozens of new DIP accounts; and (vii) protect the value of the Debtors' business for the benefit of all stakeholders.

---

[1] Olo, Inc ("Olo") is a third-party technology provider that supplies the Debtors with the software infrastructure used to manage online ordering, payment processing, menu integration, and guest-engagement functions for both first-party and third-party digital sales channels.

10

38. Given the importance of this system and the risks of interruption, I believe the relief requested in the Cash Management Motion is both necessary and in the best interests of the Debtors, their estates, employees, creditors, and other stakeholders.

**B.    Payroll Motion**

39. The Debtors are seeking authority to pay approximately $138,000.00 in prepetition wages, salaries, and related obligations, as well as to continue employee benefits programs in the ordinary course. The Debtors employ teams responsible for restaurant operations, training, food preparation, guest services, and management functions across multiple locations. These employees are essential to keeping restaurants open, maintaining food safety standards, and preserving revenue.

40. As detailed in the Payroll Motion, the Debtors employ approximately 250 restaurant-level employees across sixteen Debtor-owned locations, as well as seven (7) Restaurant Support Center employees who provide essential operational, human resources, district management, and marketing support. These employees are critical to the Debtors' ability to operate their stores safely, maintain food-quality standards, and generate daily revenue.

41. The Debtors rely on Insperity PEO Services, L.P. to process bi-weekly payroll, withhold and remit taxes, administer employee benefits, and provide workers' compensation and employer-liability coverage. Insperity withdraws payroll funds from the Debtors' operating account immediately prior to each scheduled payroll. On December 5, 2025, the Debtors funded and completed payroll for the period ending December 1, 2025. The next bi-weekly pay period runs from December 2 through December 15, 2025 (the "Pay Period"), with wages scheduled to be paid on December 19, 2025. As a result, the prepetition portion of the Debtors payroll runs from December 2nd through December 8, 2025, which amount equals approximately $138,000.00. Insperity withdraws funds from the Debtors' operating account one day prior to each scheduled payroll to cover employee wages, the employer's portion of payroll taxes, and Insperity's service fees. For the seven RSC employees, Insperity withdraws the payroll amount on the pay date itself. The Debtors' average monthly payroll obligations are approximately $470,000.00 for restaurant-level employees and $84,000.00 for RSC employees, resulting in an annual aggregate payroll of

11

roughly $6.64 million.[2]

42.   Because the Debtors operate in a labor-intensive industry and many employees rely on regular income without the ability to absorb pay delays, any interruption in payroll—even for a single cycle—would likely result in absenteeism, resignations, and operational shutdowns. Such interruptions would directly undermine the Debtors' ability to preserve going-concern value and would jeopardize the success of these chapter 11 cases.

43.   To the best of my knowledge, none of the employees to be paid are insiders. I have been advised by the Debtors' bankruptcy counsel that the amounts owed fall within the statutory priority limits for employee wage claims. I also understand, based on discussions with our financial advisors, that the Debtors have sufficient liquidity to make the requested payments without impairing their ability to meet administrative expenses during these Chapter 11 cases.

44.   LBBP entered into a Workforce Optimization Agreement with Insperity on March 24, 2021. Under that agreement, Insperity provides a comprehensive suite of human-resources services, including payroll processing, employee onboarding and administrative management, workers' compensation coverage, employer-liability protection, benefits administration, and access to retirement plans. In exchange for these services, the Debtors pay a Comprehensive Service Fee each pay period in the amount of 3% of the payroll. Insperity is fully integrated into the Debtors' payroll and benefits infrastructure, and the Debtors rely on Insperity for statutory compliance, coordination of benefits, proper withholding and remittance of taxes, and uniform administration of employee-related obligations. Any disruption in Insperity's services would impair the Debtors' ability to operate, create immediate compliance risks, and cause uncertainty among employees concerning wage payments and benefits coverage.

45.   Accordingly, the Payroll Motion seeks authority for the Debtors to pay accrued but unpaid prepetition wages, salaries, and related obligations earned during the pay period immediately preceding the Petition Date, as well as authority to continue paying wages, benefits,

---

[2] The Debtors also utilize one independent contractor located in Canada who provides certain administrative and operational support services. That contractor is paid through The Staffing Edge ULC, operating as The Payroll Edge (Michael Jakubowski). The individual does not appear on the Debtors' payroll administered by Insperity.

12

1 payroll taxes, and related expenses in the ordinary course going forward. The relief requested is
2 narrowly tailored and essential to retaining the Debtors' workforce, maintaining safe and
3 continuous restaurant operations, and preventing immediate and irreparable harm to the estates

4     46. Any delay in payroll would risk immediate turnover, restaurant closures, and
5 disruption of core operations, all of which would impair the Debtors' ability to operate as debtors
6 in possession and to preserve going-concern value. The relief requested is limited, necessary, and
7 consistent with the Debtors' historical compensation practices.

    **C.     Motion to Consolidate Matrix and redact employee personal information**

9     47. The Debtors have also filed a motion seeking limited administrative relief to
10 streamline case administration and protect individual privacy. First, the Debtors are seeking
11 authority to file and maintain a single, consolidated creditor matrix and a consolidated list of the
12 Debtors' thirty (30) largest unsecured creditors, rather than preparing separate matrices and "top
13 twenty" list for each Debtor. The Debtors operate as an integrated enterprise with shared systems,
14 vendors, and creditor constituencies. Preparing separate matrices would be duplicative, time-
15 consuming, and would increase the risk of errors at a time when accuracy and efficiency are
16 critical.

17     48. Second—and most importantly from my perspective—we are requesting authority
18 to redact from public filings the names, home addresses, and other personal identifying
19 information of the Debtors' employees and other individual creditors. Our employees work in
20 public-facing restaurant environments, and many of them are hourly or entry-level workers who
21 have no expectation that their personal contact information will be published on the internet as
22 part of a federal court proceeding. In my view, public disclosure of their home addresses creates
23 unnecessary risks, including identity theft, harassment, and possible safety concerns for
24 employees who have experienced domestic instability or who simply do not want their personal
25 information made publicly available. I am advised by bankruptcy counsel that section 107(c) of
26 the Bankruptcy Code permits this type of protection where disclosure would create an undue risk
27 of harm, and I believe that protection is warranted here. My intent is not to limit notice, but to
28 ensure that our employees—who had no role in the financial circumstances that resulted in these

13

filings—are not exposed to avoidable privacy and safety risks as a consequence of this case.

### D. Lease Rejection Motion

49. Separately, the Debtors have prepared a motion seeking authority to reject certain non-residential leases, which will be filed on shortened notice rather than presented at the First Day Hearings. As described in the Lease Rejection Motion, the Debtors are party to seventeen (17) unexpired non-residential real property leases covering locations that are no longer operating, no longer needed, and cannot contribute to the Debtors' reorganization efforts. Each of these locations—identified on Exhibit A to the Motion—was closed prior to the Petition Date, has been fully vacated and has been surrendered to the respective landlord. These sites do not generate revenue and no longer align with the Debtors' go-forward business strategy. Continuing to perform under these leases would require the Debtors to incur ongoing post-petition rent, CAM charges, utilities, taxes, and other occupancy costs for restaurants that provide no operational benefit to the estates. In my judgment, prompt rejection of these leases is necessary to prevent unnecessary administrative expenses and preserve liquidity during the early stages of these Chapter 11 cases.

50. The Debtors anticipate filing a plan that will provide creditor recoveries through a unified distribution pool. Reducing ongoing lease liabilities is essential to maximizing the funds available for creditor distribution and to ensuring that the Debtors preserve sufficient liquidity to operate during the Chapter 11 process. Rejection will significantly reduce administrative expenses by eliminating post-petition rent obligations and avoiding the accrual of unnecessary additional charges at the closed locations.

51. Based on my review of the Debtors' operations, the financial condition of the closed locations, and the advice I have received from the Debtors' bankruptcy counsel, I believe that rejecting the non-residential real property leases identified in Exhibit A to the Lease Rejection Motion is necessary to reduce ongoing administrative expenses, preserve limited cash resources, and allow the Debtors to focus on the stores that can be successfully operated going forward. I have been advised that the relief requested in the Lease Rejection Motion is appropriate and necessary to support the Debtors' restructuring efforts, and I believe it is in the best interests of

the Debtors, their estates, and all stakeholders.

52. The relief requested in the Payroll Motion, Cash Management Motion, and Creditor Matrix is essential to preventing immediate and irreparable harm. These motions protect employees, stabilize daily operations, preserve cash management systems, and allow the Debtors to transition into chapter 11 case.

53. Based on my knowledge of the Debtors' business and liquidity needs, I believe each request is necessary to preserve going-concern value and is in the best interests of the Debtors' estates and all creditors.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 9th day of December 2025..

By: ___/s/ Carl Chang___
Carl Chang, Founder

15

**Exhibit A**

**Exhibit A**